UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CANON KOCAR,

Plaintiff,

-against-

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   3/2/2022   

19 Civ. 11508 (AT)

**ORDER**

ANALISA TORRES, United States District Judge:

Plaintiff, Canan Kocar, brings this action against the Port Authority of New York and

New Jersey (the "Port Authority") alleging employment discrimination on the basis of sex,

national origin, and religion, and retaliation, in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment.

Compl., ECF No. 1.  The Port Authority moves for summary judgment.  Def. Mot., ECF No. 37.

For the reasons stated below, the motion is GRANTED in part, and DENIED in part.

## BACKGROUND[1]

Plaintiff is a Muslim woman of Turkish origin.  Pl. 56.1 ¶ 86, ECF No. 44.  She has

worked at the Port Authority since 2002, beginning as a police recruit.  Def. 56.1 ¶ 7, ECF

No. 40.

In 2004, Plaintiff was assigned to the Lincoln Tunnel command.  *Id.* ¶ 9.  Plaintiff states

that while stationed there, she was physically and verbally abused by fellow officers, including

being told by Sergeant Pete Schillizzi on an unspecified date that he "hates Muslim people and

---

[1] The facts in this section are taken from the parties' 56.1 statements, unless otherwise noted.  Citations to a
paragraph in the Rule 56.1 statement also includes the other party's response.  The Court considers admitted for
purposes of the motion any paragraph that is not specifically controverted by a correspondingly numbered paragraph
in the statement required to be served by the opposing party. Local Civ. R. 56.1(c).  Where there are no citations, or
where the cited materials do not support the factual assertions in the statements, the Court may disregard the
assertion.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).

they should kill all Muslims," and that Plaintiff was "taking a man's job." *Id.* ¶ 12.  In April 2008, Plaintiff was handcuffed to a chair by three male police officers. *Id.* ¶ 16.  An internal investigation into the incident recommended "major discipline" for the officers involved. *Id.*; *see also* ECF No. 38-6.  One officer was suspended for fifteen days.  Pl. 56.1 ¶ 92.

In September 2008, Plaintiff transferred voluntarily to the World Trade Center ("WTC") command.  Def. 56.1 ¶ 19.  There, she endured "abusive comments" and the demeaning conduct of Sergeant Raymond Maniscalco, including his referring to her as "you Muslim," telling her "Nobody likes you . . . You're not wanted here," and "chas[ing]" her into the women's locker room.  Kocar Decl. ¶¶ 43–51, ECF No. 43.  In early 2010, on two occasions, Plaintiff received an anonymous voicemail and nine text messages, some of which referenced the handcuffing incident. *Id.* ¶¶ 52–53.  In November 2010, Plaintiff filed a complaint with the Port Authority's Office of Equal Employment Opportunity Compliance, Diversity & Inclusion (the "EEO"), alleging that Maniscalco's treatment of her had created a hostile work environment.  Def. 56.1 ¶¶ 20, 24.  The Port Authority conducted an investigation, concluded that Plaintiff's hostile work environment allegations could not be substantiated, and attributed the problems to "personality and management issues." *Id.* ¶¶ 26–27.

In June 2014, Plaintiff voluntarily transferred to the Port Newark command. *Id.* ¶ 29.  In October 2018, Plaintiff submitted a memorandum to Inspector Kevin Fowler alleging that Sergeant Thomas Bongiovanni had created a hostile work environment at Port Newark and detailing numerous instances of misconduct by Bongiovanni. *Id.* ¶ 31.  In the memorandum, Plaintiff stated that she had not had problems with other sergeants at Port Newark until Bongiovanni's transfer there in June 2018. *Id.* ¶ 32.  According to Plaintiff, on multiple occasions Bongiovanni removed Plaintiff from desk duty, Kocar Tr. II, at 15–17, ECF No. 38-4,

and told her "I'm the boss . . . I do what I want," *id.* at 20–21.  Plaintiff testified that

Bongiovanni once told her to "stand down," in an unprofessional tone of voice; *see id.* at 70–76,

that he "made [her] feel uncomfortable" about raising workplace problems, *id.* at 63, and that, on

one occasion, he told her in front of other officers that he "own[ed] [her]," *id.* at 76.  In

September 2018, Plaintiff confronted Bongiovanni about being removed from desk duty,

whereupon Bongiovanni yelled at her, called her a "fifteen-year rookie," and stated that she

would never work as a desk officer while he was a sergeant.  Def. 56.1 ¶ 41; Kocar Tr. II at

15–22.  Bongiovanni subsequently "pushed [Plaintiff] out of the way" as he exited his office, and

"put his finger" near Plaintiff's eye.  Kocar Tr. II at 48–53.

   After Fowler received Plaintiff's memorandum, he told Plaintiff he would "get to the

bottom of this and contact EEO."  Def. 56.1 ¶ 46.  Fowler then emailed Chief Geraldo Silva,

listing Plaintiff's complaints against Bongiovanni, and stating, "if the behavior described by her

was accurate," it was "unacceptable," because supervisors could not "speak disrespectfully or in

a threatening manner."  *Id.* ¶ 47.  Fowler's email stated that he intended to "follow through with

EEO" and "investigate further," by speaking with both Plaintiff and Bongiovanni.  *Id.*  In

September 2018, the EEO interviewed Plaintiff.  *Id.* ¶ 48; Dunson-Harrison Decl. ¶ 5, ECF No.

38-7.  In an email dated December 11, 2018, the EEO informed her that its investigation had not

"affirm[ed] a violation of Title VII," and attributed the problems between Plaintiff and

Bongiovanni to "different communication styles, work practices, and expectations."  Def. 56.1

¶ 50.  The EEO conceded, however, that "certain statements [] Bongiovanni made, while not

discriminatory, were inappropriate" and said that these statements "had been addressed."  *Id.*  In

September 2019, Bongiovanni was promoted and transferred to another location, and Plaintiff

has not worked with him since then.  *Id.* ¶ 51.

Prior to Bongiovanni's transfer, Plaintiff escalated her complaint about Bongiovanni removing her from desk duty to Lieutenant Michelle Serrano-Adorno.  Kocar Tr. II at 15, 23. Serrano-Adorno responded that Plaintiff was "not good at the desk" because of her "voice," and identified three male officers Serrano-Adorno characterized as "excellent at the desk."  *Id.* at 23– 24.  While at Port Newark, Plaintiff attempted to obtain a recommendation from Serrano-Adorno, or her approval to apply for at least three positions—"silver shield," assignment to the counter-terrorism unit, and college recruiter.  Kocar Decl. ¶¶ 73–76.  Serrano-Adorno declined Plaintiff's requests.  *Id.* ¶¶ 74–76.  Instead, Serrano-Adorno nominated male officers from the department for those posts.  *Id.* ¶¶ 75–76; Kocar Tr. I at 255, ECF No. 38-3.  When Plaintiff asked Serrano-Adorno for "constructive criticism" to improve her chances of selection, Serrano-Adorno "didn't answer" and gave Plaintiff the "silent treatment."  Kocar Tr. I at 257.

While employed at the Port Authority, Plaintiff sought, on several occasions, a promotion to the titles of "detective" and "sergeant."  *Id.* ¶¶ 56, 57, 59.  Most recently, Plaintiff applied for elevation to detective in 2016 and 2019, *id.* at ¶¶ 60, 70; and to sergeant in 2018 and 2019, *id.* ¶¶ 69, 77.  In 2016, candidates for promotion to detective were first evaluated by a review board. *Id.* ¶ 63.  Thereafter, the most competitive candidates were invited to perform in a Qualifications Review Meeting ("QRM"), akin to an interview.  *Id.* ¶ 63.  Following the QRM, the review board compiled a list of candidates recommended for promotion, and, as vacancies arose, candidates would be selected and promoted from that list.  *Id.*  During the 2016 process, Plaintiff was "highly recommended" by her commanding officer, Captain Gutch, and participated in a QRM in February 2017.  *Id.* ¶ 64.  As a result, the review board rated Plaintiff "highly recommended," and she was placed on the list of recommended candidates.  *Id.* ¶ 65.  The 2016

list remained effective until it was replaced by a list of candidates derived from a similar process in 2019.  *Id.* ¶¶ 66, 71.

In March or April 2019, Plaintiff was evaluated for elevation to detective by her supervisor, Captain John Denesopolis.  Denesopolis Aff. ¶ 4, ECF No. 38-21.  Because Denesopolis had only recently assumed his position, he relied on feedback from other officers, including Serrano-Adorno and Sergeant Christopher Daly.  *Id.* ¶ 5.  Plaintiff claims that Denesopolis also sought the input of Bongiovanni and Sergeant Patrick Monahan, who allegedly once referred to Plaintiff as "the Taliban" while she was stationed at Port Newark.  Kocar Tr. II at 89–90, 110.

The Port Authority's human resources ("HR") department then informed Plaintiff that her commanding officer had not recommended her for promotion to detective.  *Id.* at 106–07.  Denesopolis told Plaintiff that he had given her a rating of "recommended" as opposed to "highly recommended"—the designation she had received in 2016.  *Id.* at 108–09.  As a result, Plaintiff was not offered an interview for the detective post, and was not promoted.  *See id.* at 108.

Candidates for promotion to sergeant must first pass a written examination to be eligible.  *See id.* at 100.  Though Plaintiff applied for elevation to sergeant in 2010, 2015, 2018, and 2019, she only passed the written test during the 2019 promotion cycle.  Def. 56.1 ¶¶ 57, 59, 69, 77.  Similar to the detective promotion process, candidates for sergeant were evaluated by the review board.  Then, the most competitive candidates participated in a QRM.  *Id.* ¶ 80.  Thereafter, the review board would determine the candidates' overall recommendation rating, and recommended candidates would be promoted as vacancies arose.  *Id.*  Plaintiff testified that she was highly recommended by her commanding officer, Sergeant Freeman, and participated in a QRM on July

2, 2020.  *Id.* ¶ 81.  Plaintiff received a score of "needs development" based on her QRM.  *Id.*

¶ 83.  All candidates who received a score of "needs development" were designated as "not

recommended" for promotion.  *Id.* ¶ 85.  In November 2020, the Port Authority's HR team

informed Plaintiff that she would not be promoted to detective.  ECF No. 38-19.

On December 27, 2018, Plaintiff filed a charge with the Equal Employment Opportunity

Commission ("EEOC"), alleging retaliation and discrimination on the basis of sex, religion, and

national origin.  Def. 56.1 ¶ 5; ECF No. 1-1.  Plaintiff commenced this action on December 16,

2019.  *See* Compl.

## DISCUSSION

I.    Legal Standard

Summary judgment is appropriate when the record shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a genuine

dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1);

*Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If

the nonmoving party has the ultimate burden of proof on specific issues at trial, the movant may

also satisfy its own summary judgment burden by demonstrating that the adverse party cannot

produce admissible evidence to support an issue of fact.  *Celotex*, 477 U.S. at 322–23; *PepsiCo,

Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  If the moving party meets

its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of

material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). In deciding the motion, the Court views the record in the light most favorable to the nonmoving party. *Koch*, 287 F.3d at 165.

The Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quotation marks and citation omitted). That said, summary judgment is warranted if the opposing party "relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (quotation marks and citation omitted). To defeat summary judgment, the opposing party must set forth "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256.

II.    Procedural Issues

A.  Plaintiff's 56.1 Statement

Local Civil Rule 56.1 governs factual statements on motions for summary judgment. It requires a party moving for summary judgment to submit "a separate, short and concise statement" setting forth material facts as to which there is no genuine issue to be tried. Local Civ. R. 56.1(a). A party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. *Id.* 56.1(b). "Each numbered paragraph in the statement of

material facts . . . will be deemed to be admitted . . . unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party." *Id.* 56.1(c). Further, "[e]ach statement by the movant or opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." *Id.* 56.1(d). Plaintiff's 56.1 statement fails to comply with these requirements, in that several of her objections and affirmative statements lack a citation to record evidence. The Court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may "opt to conduct an assiduous review of the record" where a party's 56.1 statement is deficient. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations and internal quotation marks omitted). The Court will do so here. However, when "objections are unsupported by the record, they are conclusory and cannot create a genuine dispute of material fact." *Mortimer v. Wilson*, No. 15 Civ. 7186, 2020 WL 3791892, at *6 (S.D.N.Y. July 7, 2020). The Court will rely, therefore, only on those statements that are free from these defects. *See id.*

### B. Statute of Limitations

To claim a violation of Title VII, a claimant must file administrative charges with the EEOC within 180 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). "A claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct." *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 514 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017). Although claimants whose claims are under the jurisdiction of a state or local agency have 300 days to file a charge, the Port Authority, as a bi-state entity, is not subject to the jurisdiction of state or local human rights agencies in either New Jersey or New York, and

thus, claimants bringing employment discrimination claims against it are subject to the standard

180-day filing limitation. *E.g. Dezaio v. Port Auth. of N.Y. and N.J.*, 205 F.3d 62, 64 (2d Cir.

2000). Here, Plaintiff filed her charge of discrimination with the EEOC on December 27, 2018.

ECF No. 1-1. The Port Authority argues that claims arising from acts which occurred prior to

June 30, 2018, are time barred. Def. Mem. at 14, ECF No. 39. Plaintiff contends, however, that

such acts occurring before the operative date fall under the continuing violations doctrine. Pl.

Opp'n at 14–18, ECF No. 42. The Court disagrees.

Under the continuing violations doctrine, "a plaintiff who files a timely EEOC charge

about a particular discriminatory act committed in furtherance of an ongoing policy of

discrimination extends the limitations period for all claims of discriminatory acts committed

under that policy even if those acts, standing alone, would have been barred by the statute of

limitations." *Lightfoot v. Union-Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997). To invoke

this doctrine, "there must have been an actionable adverse employment action within the

limitations period." *Almontaser v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 5621, 2014 WL 3110019,

at *5 (E.D.N.Y. July 8, 2014). In addition, a plaintiff must demonstrate that the alleged conduct

is part of "an ongoing policy of discrimination," rather than merely a series of "discrete

incidents . . . that are not related to discriminatory policies or mechanisms," which do not fall

within the scope of the continuing violations doctrine. *Little v. Nat'l Broadcasting Co., Inc.*, 210

F. Supp. 2d 330, 366 (S.D.N.Y. 2002) (citations omitted); *see also Nat'l R.R. Passenger Corp. v.

Morgan*, 536 U.S. 101, 114 (2002). And, "completed acts," including a failure to promote,

discontinuance of a particular job assignment, transfers, or changes in assignments or duties, are

not "acts of a continuing nature," and thus are not actionable under the "continuing violations"

doctrine. *Anderson v. N.Y.C. Dep't of Finance*, No. 19 Civ. 7971, 2020 WL 1922624, at *4

(S.D.N.Y. Apr. 21, 2020) (collecting cases) (citation omitted).  Similarly, "each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice" that starts the limitations period anew.  *Morgan*, 536 U.S. at 114.

Here, Plaintiff has not shown that the discriminatory conduct she experienced was part of an ongoing policy of discrimination.  Plaintiff's claims predicated on "distinct acts of discrimination or retaliation" that occurred prior to June 30, 2018, including her claims as to denied promotions and for changes in her assignments or responsibilities, are, therefore, time barred.  *Id.* at 105, 122.

The applicability of the continuing violations doctrine to Plaintiff's hostile work environment claim, however, is analyzed separately.  Hostile work environment claims are "composed of a series of separate acts that collectively constitute one unlawful employment practice.  *Id.* at 117.  Provided that any one act contributing to the claim occurs within the filing period, the court may consider the entire time period of the hostile environment for purposes of determining liability, even if some component acts would individually be time barred.  *Id.*  In determining the scope and time period of the hostile work environment, however, the Court must determine "whether the acts about which an employee complains are part of the same actionable hostile work environment practice," and if so, whether any of those acts fall within the statutory time period.  *Id.* at 120.  If the court finds that acts outside the limitations period are dissimilar or unrelated to the acts within the limitations period, the employee cannot allege the prior acts as part of the same hostile work environment claim and recover for them on that basis.  *Id.* at 118.

When, as here, a plaintiff alleges incidents and episodes spanning several years as part of a single hostile work environment claim, courts must "make an individualized assessment of whether [these] incidents and episodes are related."  *McGullam v. Cedar Graphics, Inc.*,

609 F.3d 70, 77, 82 (2d Cir. 2010).  In doing so, courts consider the similarity of the environment

in which the incidents took place, the nature of the incidents, and the temporal discontinuity of

the incidents.  *Id.; see also Morgan*, 536 U.S. at 121 (concluding plaintiff had established single

hostile work environment claim where "pre- and post- limitations period incidents involve[d] the

same type of employment actions, occurred relatively frequently, and were perpetrated by the

same managers" (alteration in original) (citation omitted)).

　　　Allegations involving "different co-workers and supervisors, in different time periods,

and [in] different [departments]" do not constitute a single hostile work environment.  *Little*,

210 F. Supp. 2d at 368; *Anderson*, 2020 WL 1922624, at *4 (finding continuing violations

doctrine inapplicable to hostile work environment claim where allegations spanned thirteen

years, where plaintiff worked in various departments, and where different managers or co-

workers were the source of each instance of discrimination).  Similarly, courts may deem

incidents and episodes unrelated where they are separated by intervening action by the employer,

including investigating or otherwise acting on the basis of a plaintiff's complaint, or transferring

a plaintiff to a different department.  *McGullam*, 609 F.3d at 77.  Plaintiffs cannot "resurrect stale

claims by stating that dissimilar acts are related," for to do so would transform the continuing

violation doctrine into "a boundless exception to the statute of limitations."  *Crosland v. City of

New York*, 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001) (citation omitted).

　　　Given the numerous differences in each of the "incidents and episodes" comprising

Plaintiff's allegations, the Court cannot find that Plaintiff has established a single, actionable

hostile work environment.  First, Plaintiff alleges acts of discrimination that span almost two

decades, and specific instances of discrimination are temporally separated by at least a few years.

*Compare, e.g.*, Kocar Decl. ¶ 7 (describing discriminatory comments made to Plaintiff in 2003)

*with id.* ¶ 12 (describing Plaintiff finding a pork sausage in her uniform pocket in 2005). "[T]his discontinuity is fatal[.]" *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d. Cir. 1998) (finding that a two- and five-year gap between events rendered them "not [sufficiently] continuous in time" to constitute the same hostile work environment claim).

Second, Plaintiff alleges that every incident was perpetrated by different employees, and there is no overlap in perpetrators within and outside the limitations period. These incidents took place at four separate police commands over the span of Plaintiff's two-decade career with the Port Authority. Moreover, the Court cannot conclude that Plaintiff's allegations involve the same type of employment actions during and before the limitations period. Within the limitations period, Plaintiff alleges, *inter alia*, that Bongiovanni created a hostile work environment by repeatedly removing her from desk duty, calling her a "fifteen-year rookie," and telling her he "own[ed] [her]" and that he was "the boss." Kocar Tr. II at 15–22, 51, 76, 80. The nature of these comments is quite different from, for instance, Plaintiff's allegations of racial and religious epithets at the Central Police Pool in 2003 and the Lincoln Tunnel Command in 2008, *see* Kocar Decl. ¶¶ 7, 12, 13, or her allegations that she was handcuffed to a chair and taunted by other officers in 2008, *id.* 18–34.

Finally, these incidents are separated by the Port Authority's "intervening action[s]" including multiple investigations into Plaintiff's claims, *see* Def. 56.1 ¶¶ 16, 47, 48, 50, and Plaintiff's transfer to different locations, *id.* at ¶¶ 19, 29. "[G]iven the difference in perpetrators, supervisors, unit assignment, and type of harassment," *Armstrong v. Metropolitan Transp. Auth.*, No. 07 Civ. 3561, 2015 WL 992737, at *4 (S.D.N.Y. Mar. 3, 2015), and the intervening actions taken by the Port Authority, McGullam, 609 F.3d at 77, the Court finds that Plaintiff cannot invoke the continuing violations doctrine to save her untimely allegations. .

Plaintiff attempts to rely on a non-binding concurring opinion in *McGullam* that suggests that a plaintiff could hypothetically establish "that the harassment she endured while working in two different departments" of the same company "was part of the same unlawful employment practice" by proffering evidence showing "that an entire company, including multiple departments, was permeated with gender-based discriminatory intimidation, ridicule, and insult, and that upper-level management knew of, and tolerated this condition." *McGullam*, 609 F.3d at 82 (Calabresi, J., concurring). But Plaintiff has not adduced evidence of this nature. Plaintiff provided limited testimony that two other female officers "had issues" with one of the sergeants who had made derogatory comments to Plaintiff, Kocar Tr. I at 132–33, but this does not support a broad finding that Port Authority employees were routinely subjected to such discriminatory behavior, *see Morgan*, 536 U.S. at 121 (finding hostile work environment claim based on pre-limitations period conduct where plaintiff "presented evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets"). Similarly, Plaintiff has not demonstrated that upper-level management at the agency tolerated the alleged conduct. To the contrary, Plaintiff concedes that the Port Authority investigated several of the alleged incidents of discrimination, and that the agency disciplined or reprimanded the officers involved, even though Plaintiff disagrees with the conclusions of these investigations and the extent of the discipline imposed. *See* Compl. ¶¶ 24, 26, 60–62; Pl. 56.1 ¶ 92.

The Court concludes, therefore, that Plaintiff's claims premised on allegations occurring prior to June 30, 2018, are time barred. The Court shall consider on the merits all of Plaintiff's failure to promote and associated retaliation claims where Plaintiff learned of the promotion denial on or after June 30, 2018. In addition, the Court shall consider Plaintiff's hostile work

environment claim as concerning only allegations stemming from the alleged abuse and discrimination by her supervisor, Bongiovanni, at the Port Newark location, which began around June 2018.  Def. 56.1 ¶ 32.  The Court shall also consider prior acts of discrimination and alleged promotion denials as "background evidence to support [Plaintiff's] timely claims" even though claims based on those acts are time barred.  *Morgan*, 536 U.S. at 102.

### III.   Title VII Discrimination Claims

Plaintiff brings a cause of action for discrimination under Title VII based on national origin, religion, and sex.  Compl. ¶ 82.  The Court construes this as raising two separate claims, one based on the Port Authority's failure to promote Plaintiff, and the other based on Plaintiff's hostile work environment allegations at Port Newark.  The Court addresses each in turn.

#### A.  Failure to Promote Claims

Plaintiff alleges that she was "denied . . . promotional opportunities" by the Port Authority multiple times, including when she was evaluated for elevation to sergeant in 2018 and 2019, and for promotion to detective in 2016 and 2019.  *Id*. ¶¶ 64–66.  Under Title VII, to withstand a motion for summary judgment on a failure to promote claim, a plaintiff must satisfy the burden-shifting analysis set forth in *McDonnell Douglas v. Green*.  *See McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  A plaintiff first bears the burden of establishing a *prima facie* case of discrimination.  Once this *prima facie* case is made, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the failure to promote.  *Id.*  The burden then shifts back to the plaintiff to show that the employer's proffered reason was mere pretext for discrimination.  *Id.*

14

To establish a *prima facie* case of discrimination, Plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action—here, a failure to be promoted; and (4) that the action occurred under circumstances giving rise to an inference of discriminatory intent. *McDonnell Douglas*, 411 U.S. at 802. To demonstrate a basis for an inference of discrimination at the *prima facie* stage, Plaintiff has a "minimal" burden. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). Circumstances contributing to an inference of discrimination may include the employer continuing to seek applicants with the plaintiff's qualifications for the position after denying the plaintiff the promotion, criticizing the plaintiff's performance in ethnically degrading terms, making invidious comments about people in the protected class, or treating employees outside the protected class more favorably. *Chambers v. TRM Copy Ctrs.*, 43 F.3d 29, 37 (2d Cir. 1994).

The Port Authority does not contest the first three elements and instead focuses on the fourth, contending that Plaintiff has failed to show that her promotion denials occurred under circumstances giving rise to an inference of discriminatory intent. Def. Mem. at 25–26.

During the 2016 detective promotion process, Plaintiff was ranked "highly recommended" and placed on a list of candidates eligible for promotion, based on feedback from her commanding officer and the results of her QRM. Def. 56.1 ¶¶ 64–65; Kocar Tr. II at 103. The 2016 list expired in May 2019, when it was replaced by a list of recommended candidates from the 2019 detective promotion process. Def. 56.1 ¶¶ 66, 67, 71. Though the 2016 and 2019 detective promotion processes were similar, *id.* ¶ 71, Plaintiff was not on the 2019 recommended list, based in part on the promotability rating Plaintiff received from her commanding officer, Denesopolis. To provide the rating, Denesopolis, who had limited personal experience with Plaintiff, solicited feedback from other officers. The parties dispute which officers Denesopolis

15

consulted.  Although Denesopolis claims he solicited feedback from only Serrano-Adorno and Daly, Denesopolis Aff. ¶ 6, Plaintiff testified that Denesopolis told her he had also spoken with Bongiovanni, the subject of Plaintiff's EEO complaint, and Monahan, who Plaintiff alleges once referred to her as "the Taliban," Kocar Tr. II at 89–90, 110.

Plaintiff has adduced admissible evidence that she experienced discriminatory treatment and harassment by Serrano-Adorno at Port Newark between 2014 and 2018.  Kocar Tr. I at 251–52.  Plaintiff states that Serrano-Adorno refused to nominate Plaintiff for three special positions or designations.  *Id.* at 254–57; Kocar Decl. ¶¶ 74–76.  Instead, Serrano-Adorno recommended Plaintiff's male coworkers for these roles, and gave Plaintiff the "silent treatment" when she sought constructive criticism and feedback.  *Id.* at 254–57; Kocar Decl. ¶¶ 74–76.  Plaintiff further claims that when she spoke to Serrano-Adorno about being switched from desk to patrol duty, Serrano-Adorno told her that she was "not good at the desk" because of her voice, but named three male officers who were "excellent at the desk."  Kocar Tr. II, 23–26.

Drawing all inferences in Plaintiff's favor, and considering the *de minimis* burden on Plaintiff at this stage, the Court finds that Plaintiff's admissible deposition testimony and affidavit create an inference of discriminatory intent and therefore, raise genuine issues of material fact that preclude a grant of summary judgment.  A reasonable fact-finder could conclude that Denesopolis relied on feedback from at least two officers who had previously evinced discriminatory animus towards Plaintiff: Serrano-Adorno, who offered promotional opportunities and praise to male officers, but not to Plaintiff, and Monahan, who made derogatory comments about Plaintiff's religion.  Furthermore, a reasonable jury could conclude that Serrano-Adorno and Monahan's comments to Denesopolis, which formed the basis for his negative promotability rating of Plaintiff, were influenced by discriminatory intent, and resulted

16

in Plaintiff being denied a promotion she was otherwise qualified for.  This inference is strengthened by the fact that Plaintiff received a "highly recommended" rating in an identical promotion process just a few years earlier, when evaluated by a different supervising officer.  *See* Def. 56.1 ¶¶ 64–65.  Thus, Plaintiff has made a *prima facie* case of discrimination sufficient to shift the burden of proof to the Port Authority.

The Port Authority contends in response that Plaintiff was among fourteen "highly recommended" candidates who were not promoted from the 2016 list.  Def. Mem. at 28–29.  But, the fact that other candidates were not promoted does not provide a legitimate, non-discriminatory rationale that rebuts the inference of discriminatory intent Plaintiff has raised as to the potential bias or animus that may have influenced her promotability rating.  The Court holds, therefore, that there are triable issues of material fact as to Plaintiff's failure to promote claims for the detective position, which preclude a grant of summary judgment.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.")

The Court agrees, however, that under *McDonnell Douglas*, Plaintiff has not established a *prima facie* case of discrimination as to her failure to promote claim for the sergeant position.  Though Plaintiff applied for the title numerous times, she failed the prerequisite written exam on each occasion except during the 2019 process.  Def. 56.1 ¶¶ 57, 59, 69, 77.  And, Plaintiff does not allege that the test was conducted or evaluated in a discriminatory manner.

As to the 2019 process, Plaintiff makes only conclusory allegations that she was denied elevation to sergeant in 2019 as "retaliation for bringing this lawsuit."  Kocar Decl. ¶ 97.  Like other candidates who received a score of "needs development" on their QRM, Plaintiff was

deemed "not recommended." *Id.* ¶¶ 83, 85.  And, unlike her claims as to the detective promotion process, Plaintiff has not adduced evidence suggesting that the decisionmakers, including her commanding officer, Freeman, exhibited discriminatory animus towards her, or that the process was otherwise conducted in a discriminatory manner.  *See generally* Kocar Decl.  It is not for the Court to "assess[] the merits—or even the rationality—of [the Port Authority's] business decisions" unless there is evidence its response was motivated by discriminatory intent. *Hernandez v. Int'l Shoppes*, *LLC*, 100 F. Supp. 3d 232, 263 (E.D.N.Y. 2015) (citation omitted). The Court, therefore, cannot find that Plaintiff has satisfied the fourth prong of the *McDonnell Douglas* test.  Accordingly, the Port Authority's motion for summary judgment on Plaintiff's failure to promote claim for the sergeant position is GRANTED.

B.  Hostile Work Environment Claims

Plaintiff claims that, while stationed at Port Newark, Bongiovanni, a sergeant, verbally abused and harassed her, and that his actions gave rise to a hostile work environment.  Compl. ¶¶ 45–53, 58.  In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment," and "that there is a specific basis for imputing the conduct creating the hostile work environment to the employer."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (citation omitted).  The misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quotation marks and citation omitted).  Incidents of harassment must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 68 (S.D.N.Y. 2016) (quotation marks and

citation omitted).  Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Finally, personal animus without evidence of discriminatory bias on the basis of a protected characteristic is insufficient to establish a claim under Title VII. *See Lennert–Gonzalez v. Delta Airlines, Inc*., No. 11 Civ. 1459, 2013 WL 754710, at *8 (S.D.N.Y. Feb. 28, 2013).

As discussed above, Plaintiff's claims regarding the events that pre-date her posting at Port Newark are time barred, because they are too dissimilar to be considered part of the same work environment Plaintiff experienced at Port Newark.  There, Plaintiff states that Bongiovanni repeatedly switched her from desk duty to patrol and told her that she would "never [work] the desk" as long as he was sergeant, Kocar Tr. II at 15–22; that during an argument with Bongiovanni, he called Plaintiff a "15-year rookie" and "pushed [her] out of the way" as he exited his office, and "put his finger" near Plaintiff's eye, *id.* at 48–53; that he "made [her] feel uncomfortable," *id.* at 63; that he spoke to her unprofessionally on occasion, *see id.* at 70–76; and that, once, Bongiovanni told Plaintiff in front of other officers that he "own[ed] [her]" *id.* at 76.

Even assuming that Bongiovanni's conduct was so extraordinarily severe as to have altered the conditions of Plaintiff's working environment, she has failed to demonstrate that the alleged hostility was on account of her sex, national origin, or religion. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (noting that "mistreatment at work . . . is actionable . . . only when it occurs because of an employee's . . . protected characteristic").  Although Bongiovanni's behavior may be characterized as rude, "an expression of anger or personal animus is not

covered under Title VII." *Panchishak v. Cty. of Rockland*, No. 20 Civ. 10095, 2021 WL 4429840, at *5 (S.D.N.Y. Sept. 27, 2021).  And, although Plaintiff believes she was "singled out and harassed" by Bongiovanni "for no reason other than" her gender, religion, and national origin, Compl. ¶ 53, her "speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn," *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 271 (S.D.N.Y. 2005) (citation omitted).

The only claim of discrimination based on religion, national origin, and gender concerns a different officer, Monahan, who is alleged to have referred to Plaintiff as "the Taliban" on one occasion.  Kocar Tr. II at 89–90.  This isolated remark is not sufficiently severe or pervasive to meet the threshold of a hostile work environment claim.  *See Perez v. Commc'ns Workers of Am.*, 210 F. App'x 27, 31 (2d Cir. 2006).  And, even if the Court considers as background evidence the numerous discriminatory remarks and physical abuse Plaintiff was subjected to during prior postings, neither Bongiovanni nor Monahan were involved in this earlier conduct. These incidents shed no light on Bongiovanni or Monahan's intent, and do not further illustrate the general climate at Port Newark.  This "background evidence" cannot, therefore, strengthen Plaintiff's claim.

Accordingly, the Port Authority's motion for summary judgment on Plaintiff's Title VII hostile work environment claim is GRANTED.

IV.    Title VII Retaliation Claims

Plaintiff next alleges a claim for unlawful retaliation in violation of Title VII. Specifically, Plaintiff alleges that she was denied promotion to detective and sergeant in 2019 in retaliation for filing internal complaints about the harassment she experienced, and for filing this lawsuit.  Compl. ¶¶ 64, 75; Kocar Decl. ¶¶ 96–97.  Retaliation claims under Title VII are subject

to the same *McDonnell Douglas* burden-shifting framework, wherein the plaintiff must first establish a *prima facie* case of retaliation; after which, the burden shifts to the employer to show that the "adverse employment actions were taken for a legitimate, non-retaliatory reason." *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (quotation marks and citation omitted).  If the employer makes such a showing, the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  That is, Plaintiff must show that "the adverse action would not have occurred in the absence of the retaliatory motive."  *Vega v. Hempstead U. Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (citation omitted).

To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) her employer was aware of that activity; (3) she suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Id.*  The Port Authority does not dispute the first three elements, again contending that Plaintiff has failed to meet the fourth: establishing a causal connection between her filing of an internal complaint and the denial of the relevant promotional opportunity.  Def. Mem. at 30–31.  The Court agrees.

A causal connection can be established by showing either "that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus."  *Uddin v. City of New York*, 427 F. Supp. 2d 414, 432 (S.D.N.Y. 2006).  Here, Plaintiff has not adduced evidence of retaliatory animus, and does not allege that other employees received preferential treatment.  The Court, therefore, looks only to whether the promotion denials were sufficiently "close in time" to the filing of Plaintiff's internal complaint and this lawsuit to establish a causal connection.

The Second Circuit has not set forth a specific time period "between the protected activity and adverse employment action that defeats an inference of causation." *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005). But, courts in this Circuit have generally concluded that a gap of more than three to six months between the protected activity and the retaliatory action is insufficient to establish a causal connection. *See*, *e.g.*, *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457–58 (S.D.N.Y. 2012) (collecting cases).

Here, approximately six months elapsed between Plaintiff's filing of her internal complaint in September 2018, Dunson-Harrison Aff. ¶ 5, ECF No. 38-7, and her evaluation for promotability to detective in March or April 2019, Denesopolis Aff. ¶ 4. Similarly, over a year elapsed between Plaintiff's commencement of this action in December 2019, *see* Compl., and her denial of promotion to sergeant in November 2020, ECF No. 38-19. The temporal gap between the protected activities and the alleged retaliatory actions is, therefore, too lengthy to establish causality. Accordingly, the Port Authority's motion for summary judgment on Plaintiff's retaliation claim is GRANTED.

V.    Equal Protection Claims

Plaintiff's claims under the Equal Protection Clause of the Fourteenth Amendment are actionable against the Port Authority through 42 U.S.C. § 1983. *E.g. Holden v. Port Auth. of N.Y. and N.J.*, 521 F. Supp. 3d 415, 426–27 (S.D.N.Y. 2021). Because the Port Authority "stands in the shoes of a municipality" for purposes of a § 1983 claim, *Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536, 540 (2d Cir. 2020), it cannot be held vicariously liable in a § 1983 action for acts of its employees, *see Mack v. Port Auth. of N.Y. and N.J.*, 225 F. Supp. 2d 376, 382–83 (S.D.N.Y. Sept. 30, 2002) (collecting cases). Plaintiff must show, therefore, that

the constitutional injury she experienced was caused by "execution of a custom or policy of the Port Authority within the meaning of *Monell v. Department of Social Services*." *Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 38 (2d Cir. 1985) (citing *Monell*, 436 U.S. 658 (1978)); *see also Holden.*, 521 F. Supp. 3d at 426–27 ("Municipalities are subject to liability . . . not under a theory of *respondeat superior*, but rather on the basis that their policies or customs inflicted the alleged injuries."). In other words, the Port Authority "cannot be held liable solely because it employs a tortfeasor." *Monell*, 436 U.S. at 691 (emphasis omitted). Rather, Plaintiff must "demonstrate that, through its deliberate conduct, [the Port Authority] was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (citation omitted).

Plaintiff does not claim that her constitutional injuries under the Equal Protection clause were caused by a custom or policy of the Port Authority. Plaintiff only attributes the alleged discrimination she experienced on the basis of gender, national origin, and religion, to actions of specific Port Authority officers. *See generally* Compl. Therefore, Plaintiff has failed to allege a claim under § 1983 for violation of her constitutional rights under the Equal Protection Clause, and the Port Authority's motion for summary judgment on this cause of action is GRANTED.

VI.    Punitive Damages

Plaintiff seeks punitive damages against the Port Authority for its violation of her rights. Compl. ¶ 87. The Port Authority argues that it is immune from liability for punitive damages. Def. Reply at 10–11, ECF No. 45. The Court agrees. Numerous courts in this Circuit, as well as the Third Circuit, have ruled that the Port Authority, as an entity created by a bi-state compact, is immune from liability for punitive damages. *See*, *e.g.*, *Evans v. Port Auth. of N.Y. and N.J.*, 273 F.3d 346, 356–58 (3d Cir. 2001); *Vernon v. Port Auth. of N.Y. and N.J.*, 154 F. Supp. 2d

844, 860 (S.D.N.Y. 2001) (collecting cases).  Accordingly, the Port Authority's motion for summary judgment on Plaintiff's claim for punitive damages is GRANTED.

## CONCLUSION

For the foregoing reasons, the Port Authority's motion for summary judgment is GRANTED as to Plaintiff's Title VII hostile work environment and retaliation claims; her claim under the Equal Protection Clause of the Fourteenth Amendment enforced through 42 U.S.C. § 1983; and her claim for punitive damages.  The Port Authority's motion for summary judgment on Plaintiff's failure to promote claims under Title VII is DENIED as to the 2019 detective position, and otherwise GRANTED in all respects.  The Clerk of Court is directed to terminate the motion at ECF No. 37.

SO ORDERED.

Dated: March 2, 2022
       New York, New York

_____
ANALISA TORRES
United States District Judge